CARL M. LOEB and Others, Copartners Doing Business under the Firm Name and Style of CARL M. LOEB, RHOADES & Co., Claimants, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 25508.)

Court of Claims, August 12, 1941.

*Hays, St. John, Abramson & Schulman* [*John Schulman* of counsel], for the claimants.

*John J. Bennett, Jr., Attorney-General* [*Leon M. Layden, Assistant Attorney-General,* of counsel], for the defendant.

DYE, J. The United Cigar Stores of America filed a plan for reorganization under section 77B of the Bankruptcy Act which was approved, and among other things it provided that the holders of Series A debentures were to receive in exchange for their holdings a unit or lot of stock in the reorganized company, referred to as the United Cigar-Whelan Stores Corporation, consisting of: (a) $500 face value in sinking fund bonds; (b) 1.85 shares of new preferred stock; (c) 68 shares of new common stock. Coincident with the plan, an implementing agency known as the Phœnix Corporation offered to purchase (from the holders) the new units issued in exchange for the old debentures Series A for the sum of $667.48 each, which was to be paid at such time as the Phœnix Corporation might elect within a period of one year, which was to expire July 21, 1938.

The agreement also provided that within forty-five days after the consummation of the reorganization plan, holders of units were to deposit the new securities covered by their acceptance of the Phœnix offer with the Chase National Bank as depository, and receive a deposit receipt evidencing the deposit. Each unit or lot of new securities deposited was to be in form for transfer by delivery, accompanied by funds sufficient to cover the purchase of New York State stock transfer tax stamps at the rate of $2.12 per unit.

The depository under the agreement was to detach all coupons pertaining to the deposited unit or lots of securities, and prior to full payment by Phœnix of the purchase price, was to pay such dividends and interest received to the holder of the deposit receipt, and upon the payment to the depository by Phœnix of the sum of $667.48 for each whole unit, was to compute and add thereto the accrued but unpaid interest on the item of sinking fund bonds, the accrued but unpaid dividends on the item of preferred stock, the declared but unpaid dividends on the shares of common stock comprising each unit, and add the same to the unit purchase price.

It was also provided that Phœnix might purchase deposit receipts from time to time, and might surrender the same (duly indorsed

in blank for transfer with all required transfer tax stamps attached) to the depository for cancellation, and the depository was to forthwith deliver to Phœnix the units represented by the deposit receipts.

Phœnix Corporation, for its obligation under the agreement, was to pay the agreed purchase price of $667.48 in cash, which was to be distributed by the depository to the holders of deposit receipts, and the units or lots of stock covered thereby were to be delivered to Phœnix. The agreement also contemplated that Phœnix might buy deposit receipts in the open market, and upon their surrender (duly indorsed in blank for transfer with all required transfer tax stamps attached) to the depository, receive the units or lots of new securities represented thereby.

Default in the fulfillment of the agreement by Phœnix was anticipated, and to save a depositing security holder harmless in such an event, the agreement provided that " in the event Phœnix shall fail * * * to make full payment * * * to the depository * * * all such New Securities shall be returned to the holders of such Deposit Receipts, together with any funds received but not required to be used for the purchase of stock transfer stamps, upon surrender of the Deposit Receipts * * * duly indorsed in blank * * *; the depository shall issue to the person surrendering such Deposit Receipt a non-transferable certificate evidencing the fact that such person or his predecessor in interest had accepted said offer of Phœnix, and that Phœnix had failed to perform its obligation * * * upon presentation of such non-transferable certificates to the First National Bank of Jersey City * * * the holders thereof shall be entitled to receive a ratable distribution of the 560,000 shares of New Common Stock deposited by Phœnix as security * * * (for the due fulfillment of its obligations under the contract) and such certificates shall be duly stamped to evidence the ratable distribution and shall be returned to the holders thereof * * *. The holder of any such certificate stamped as aforesaid shall be entitled by appropriate judicial proceedings to require Phœnix to perform its obligation to purchase the New Securities as hereinabove provided or to recover damages from Phœnix for its failure to perform."

The plan was approved and units or lots of new securities, accompanied by necessary funds to purchase transfer tax stamps, were deposited in the Chase National Bank in acceptance of the Phœnix offer and the bank issued its deposit receipt in the form represented by Exhibit A attached to the claim.

Thereafter, the claimants, securities brokers, traded in the deposit receipts for their customers, and in the course of such trading attached to the deposit receipts New York State transfer tax

stamps, aggregating $3,407.93. Believing this to have been in error, and contrary to the intent and meaning of section 270 of the Tax Law, an application for refund was made to the State Tax Commission. After a hearing, the application was denied, and the claimants, under the authority of section 280, have come to this court for relief, which can only be granted by holding that trading in the deposit receipts did not constitute a taxable transfer.

A transfer may be defined as a transaction where one surrenders his interest so that it vests in another. As Justice STONE so tersely said in *Raybestos-Manhattan Co.* v. *United States* (296 U. S. 60), " While the statute speaks of transfers, it does not require that the transfer shall be directly from the hand of the transferor to that of the transferee. It is enough if the right or interest transferred is, by any form of procedure, relinquished by one and vested in another. * * * It is relinquishment of the ownership for the benefit of another, and the resultant acquisition of it by him which calls the statute into operation."

We have noted from the facts that when the unit or lot of new securities was deposited, the sale thereof was contingent upon fulfillment by Phœnix of its contract obligation, that is, payment of purchase price within one year, at which time Chase National Bank was to pay to the deposit certificate holder the sum of $667.48 per unit and deliver the deposited stock unit to Phœnix.

Were it possible to treat the instant situation as being a simple transaction where the depositor was an unconditional vendor, and Phœnix a vendee, liable only for the payment of the cash purchase price, we could assume that the parties intended the transfer to take place at the moment of the deposit of the unit of securities with Chase, and might safely conclude the deposit receipt was simply evidence of the debt, a chose in action, and that the depositor's sole remedy was a suit for the money representing the purchase price. Under such circumstances, the deposit receipts issued by Chase would, no doubt, represent a money obligation, and as such would not be taxable on sale under section 270 any more than a promissory note or bill of exchange. But such an assumption is contrary to the intention indicated by the existing facts.

In the case at bar the situation created by the agreement was not for the absolute delivery, purchase and sale of securities. It was a conditional contract. Its consummation was contingent upon fulfillment by Phœnix at any time within a year.

As security for fulfillment of its promise to pay the purchase price as above provided, Phœnix deposited with the First National Bank of Jersey City 560,000 shares of new common stock, which

were to be held as continuing collateral security for the payment of the purchase price, which shares, in the event of payment in full of the purchase price by Phœnix, were to be returned to it. In the event of default by Phœnix of its obligation to pay the purchase price within the year, the holder of the deposit receipt was to be held harmless by the return of the stock unit theretofore deposited by him with Chase, together with a *pro rata* distributive share of the new common stock deposited by Phœnix with the First National Bank of Jersey City as collateral, this being in the nature of a penalty, measured by the unit of new stock deposited. Upon return of the unit or lot of securities deposited, and the delivery over of the penalty shares, Chase, as depository, " shall issue to the person surrendering such deposit receipt, a non-transferable certificate evidencing the fact that such person or his predecessor in interest had accepted such offer of Phœnix, and that Phœnix had failed to perform its said obligation; and the Depository shall notify the First National Bank of Jersey City that Phœnix failed to pay the purchase price to the Depository as hereinabove provided." Upon presentation of the non-transferable certificate to the First National Bank of Jersey City, the holder was entitled to receive a ratable distribution of the 560,000 shares of new common stock deposited by Phœnix as security, and the certificate was to be duly stamped to evidence the ratable distribution, and returned to the holder.

When this procedure had been gone through, the holder of the non-transferable certificate, duly stamped, had an election, the agreement having entitled him: (a) " by appropriate judicial proceedings to require Phœnix to perform its obligation to purchase the New Securities, (b) to recover damages from Phœnix for the failure to perform such obligation," the market value of the collateral penalty shares received from the First National Bank of Jersey City being applied in mitigation of any damages.

It seems to this court that such an arrangement comprehended the continued existence of the identity of the unit or lot of securities deposited with the Chase Bank in the first instance, and that the deposit receipts issued therefor by Chase were the representative equivalent of the unit of new securities, particularly when we remember that while the unit was so held by Chase, all dividends declared on the stock and interest paid on the bonds received in the interim were to follow the stock, likewise interest and dividends declared and unpaid were to be accrued to the date of the payment of the purchase price. The $2.12 in cash which accompanied each unit deposited in lieu of transfer tax stamps was to follow the stock, that is, to be attached in the event of delivery to Phœnix

when it fulfilled its agreement, and to be returned in cash to the depositor when Phœnix defaulted. In the meantime, however, the deposit receipts were freely traded in, and from time to time there was a change in the ownership thereof, and by the terms of the agreement the holder thereof obtained certain privileges and elections in the event of default. The agreement said he might " by appropriate judicial proceedings require Phœnix to perform its obligation to purchase," but this right only accrued to him after Chase, as depository, returned to him the unit or lot of securities deposited and had certified to the First National Bank of Jersey City that Phœnix had defaulted, and that the holder of the non-transferable certificate was entitled to a ratable share of the 560,000 shares of the new common stock deposited by Phœnix as security, and when this penalty stock had been set over to the holder of the non-transferable certificate and the certificate duly stamped to the effect that all these prior conditions had been performed, then, and only then, could the suit for purchase price be maintained. It does not seem probable, however, that he would sue for the purchase price when the thing which he is alleged to have sold has been returned to him along with a penalty bonus, and which by the terms of the agreement, he seems to be under no necessity to deliver. This right to sue for purchase price seems impractical, and probably would not be resorted to in view of the alternative election which in substance permitted the holder of the non-transferable certificate to sue for damages. This seems to be a more logical and appropriate remedy, in view of the fact that the subject-matter of the agreement to sell had been restored to him, and particularly in view of the fact that no suit either for purchase price or for damages could be maintained until the restoration had been made. This non-transferable certificate issued by the First National Bank of Jersey City while not appearing on the record, would seem to have had the characteristics of a confession of judgment.

The basic fact, however, is that the certificates of deposit were freely traded in. They passed from hand to hand and there was a change of ownership.

From all the circumstances attending such sale, and by virtue of the characteristics above discussed, the only sensible conclusion to be arrived at is that the sale of the deposit receipt was equivalent to a sale of the stock unit it represented and as such was taxable. Had the units themselves been transferred, there would be no question about the accrual of the tax liability. We can find no distinguishing characteristic between the stock and its representative equivalent, the certificate of deposit, sufficiently distinctive

to remove it from the broad provisions of section 270 of the Tax Law.

To hold otherwise is to open the door for an extensive evasion of the Tax Law, upon which this court is unwilling to place its stamp of approval.

The statute is clear. Section 270 states: "* * * or certificates of deposit representing certificates taxable under this article * * * and whether investing the holder with the beneficial interest in or legal title to said stock * * *."

The Phœnix agreement regarded the deposit receipt as the equivalent of the deposited unit or lot of securities, for by its provisions, particularly in the agreed method for the distribution and payment over of any received interest or dividends and any that had accrued or had been declared and were unpaid at the time Phœnix elected to pay the purchase price, and made similar provision for distribution and payment in the event of the default of Phœnix, that is, they were to go to the holder of the deposit receipt in case of fulfillment, and accompany the stock in the event of default. While the contract is not binding on this court, nevertheless it may look to it in its search for an answer to the question whether or not the transfer took place at the time of delivery of the unit to the Chase Bank or at the time the purchase price is paid into the bank by Phœnix. The question having been resolved that the transfer was to take place at the time of the payment of the purchase price, the claim herein must be dismissed on the merits.